COPY

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

JASON R. RIVERA,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　) 　　CIV. 96-1092 JP/RLP
　　　　　　　　　　　　　　　　　)
　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
UNITED STATES; OFFICER THOMAS　　)　　MEMORANDUM OPINION
POULIOT, in his personal　　　　　)
capacity,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　　　)
_____)

ENTERED ON DOCKET
4/5/99

This action is brought against the United States pursuant to 28 U.S.C. § 1331 and the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, and against Thomas Pouliot, a Border Patrol Agent, pursuant to 28 U.S.C. § 1331 and *Bevins v. Six Unknown Agents*, 403 U.S. 388 (1972), for alleged torts and constitutional violations.

The claims against both defendants arise out of an incident which occurred on the evening of March 16, 1995, during which plaintiff claims that defendant Pouliot assaulted him and intentionally inflicted emotional distress upon him when Pouliot unlawfully attempted to stop and detain him without a reasonable suspicion and when Pouliot drew his weapon on plaintiff. Plaintiff also claims that the defendants are liable for Agent Pouliot's theft of plaintiff's bicycle.

The United States claims that Agent Pouliot was not acting within the course and scope of his employment as a Border Patrol Agent at the time of this incident, that the United States has not waived sovereign immunity, that the acts of Agent Pouliot

do not constitute any tort cognizable under the FTCA, that Pouliot did not commit any constitutional tort, and that plaintiff was not damaged or injured as claimed.

Pouliot denies he is liable to plaintiff and claims that he did not draw his gun and point it at plaintiff, as plaintiff claims, and that he was acting as a certified law enforcement officer within the State of New Mexico at the time of the incident giving rise to this action, as he was investigating two (2) felony occurrences (*i.e.*, the break in of two motor vehicles) as well as the possible theft of federal property. Pouliot further claims that plaintiff was not damaged or injured as plaintiff claims.[1]

Plaintiff alleges four causes of action in his complaint:

1) Claim of assault against both defendants;

2) Claim of intentional infliction of emotional distress against defendant Pouliot only;

3) Claim of theft of his bicycle against both defendants; and

4) Claim of deprivation of constitutional rights against both defendants.

A non-jury trial was held on February 1-4, 1999. After careful consideration of the evidence adduced at trial, the

---

[1] No qualified immunity claim has been alleged, briefed or argued by defendants, and the Court finds such claims, if any, have been waived.

briefs and arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## BACKGROUND

The plaintiff, Jason Rivera, has been a life-long resident of Las Cruces, New Mexico, with the exception of approximately ten months in 1990-1991 when he lived in Connecticut. At the time of trial he was twenty-eight (28) years of age. He has had a very disruptive and tumultuous childhood as reflected by the testimony of Dr. Levine. His parents were divorced and he alternately lived with his mother and his father. When he was sixteen or seventeen years old, his father literally threw him out of his home, telling plaintiff that he had to leave. He lived with cousins for a while; grandparents for a while; and in 1988, moved into a rental house which was owned by his father. He had several friends living with him. The evidence reflects that at a fairly young age, he began to drink, probably a response to the manner in which he was treated as a child. This created problems for him in school, and he had a rather erratic attendance record and a very erratic showing in the various classes that he took. As Dr. Levine stated, when asked whether the drinking was the cause of his missing classes, it was hard "to separate which came first, whether all of the emotional distress in his life and lack of support led to drinking and missing school, or whether the drinking -- itself -- led to his missing school."

He subsequently started using drugs and in high school used marijuana on a fairly regular basis. On cross-examination, he testified that during high school, he used marijuana two to five times a week, that he had used LSD on four or five occasions, and when he was sixteen or seventeen years old, he used mushrooms on two or three occasions. He also stated that he had used cocaine "not more than twenty to thirty times," having started at the age of fifteen or sixteen.

After he graduated from high school, he enrolled at New Mexico State University, and again, his academic performance was erratic. At times, he earned good grades; at other times his grades were very poor. After the first year, he dropped out, and that is when he went to Connecticut for about ten months with some friends.

When he returned he re-enrolled in the University, and again, his grades sometimes were good and sometimes were very low. He managed to keep his average at a level that permitted him to stay in college.

Beginning in 1994, he started having more serious scholastic problems, and they lasted through 1994. He stayed in school, registered for 1995 spring semester, and apparently at the beginning of the semester, was receiving good grades. After the incident of March 16, 1995, he did not return to any classes; he didn't withdraw from the university; and he ended up with grades recorded as "D's" and "F's."

Mr. Rivera has struggled with alcohol during much of his life since he was a teenager. On one occasion, he was arrested for DUI when he passed out at the steering wheel of his car while stopped at a traffic control signal.

The evidence establishes that he has a substance abuse syndrome, both before March 16 as well as after March 16. The substance primarily abused was alcohol, but he had also prior to March 16 used marijuana, cocaine, LSD, methamphetamine and mushrooms.

Defendant, Thomas Pouliot, has been a member of the United States Border Patrol since May of 1992. His first four and a half months were at the training academy at Artesia, New Mexico. While there he was required to sign an application for designation as a New Mexico peace officer. Upon completing his training he was assigned to the Las Cruces office and has served as a Border Patrol Agent at that location since 1992. This incident is the first time that he has tried to exercise his authority as a New Mexico peace officer. On March 16, 1995, he was off duty the entire day. On the evening of March 16th, he was not in uniform and was not driving an official Border Patrol vehicle. The only indicia of authority which he carried was his badge and official identification.

Much of the evidence dealt with whether defendant Pouliot was acting under his authority as a Border Patrol Agent and within the scope of his employment. As the Court has concluded from the evidence that the defendant did not assault

-5-

the plaintiff, intentionally inflict emotional distress upon plaintiff, steal his bicycle, or deprive him of any constitutional rights, it is not necessary to address the issue of whether the United States is liable as the employer of Pouliot.

**FACTS**

There is little dispute as to the facts up until the time that Pouliot backed his pickup in a westerly direction on East May Street to a position just west of 1208 East May, the residence of Kathy Apodoca and Jesus Aguirre (Chuey).

Plaintiff had gone to soccer practice late in the afternoon of March 16, 1995, following which he had gone to the Rock Island Club with six or seven of his teammates for some beer. He remained at the Rock Island for about one and a half hours or until 8:30 or 9 p.m. He then rode his bike to his home where he remained for fifteen or twenty minutes and then he rode his bicycle to 1208 East May to get a board game. He arrived at Kathy and Chuey's in the neighborhood of 9:15 or 9:30 p.m. From his house he rode south on Virginia to East May, and then west to 1208 East May, which was located on the south side of East May. As he turned the corner, he testified he rode down the south side of East May and saw Pouliot's pickup east-bound on East May Street. The truck was going very slowly and as they passed one another, he saw one person, Pouliot, in the pickup. He testified that almost immediately afterward, he saw the brake lights and reverse lights come on simultaneously and the truck began to back

up. He hurried to Kathy and Chuey's, stopping at a gate on the west side of their lot, and got off his bike. The pickup continued to back up until it was even with or a little west of where he had stopped.

After this incident, he claims he drank three-quarters of a bottle of vodka at Kathy and Chuey's, although Kathy testified that they never had any hard liquor in the house as neither she or Chuey drank hard liquor.

Pouliot and his wife and other Border Patrol Agents had gone bowling at the Sun Lanes Bowling Alley on Amador Street. Around 8:30 p.m., they were advised by the security guard at the bowling alley that some one had broken into one of their trucks. The agents went out and identified the truck as Agent Parks' truck and discovered that some stereo speakers and a jack had been stolen. This theft was reported to the police after they returned to the bowling alley. A few minutes later, the guard returned and advised them another truck had been broken into. The agents again went out and discovered Agent Dalton's pickup had been broken into, some items stolen from the truck, and his Trique bag was missing. Agents use the Trique bag for storing sensor maps and radios, both very sensitive items, as well as other items they use in their work, sometimes including their handgun.

The guard said he had heard someone whistle from the corner of the bowling alley, a common method used for signaling from his experience as a security guard. Believing the Trique

-7-

bag stolen (it was later discovered, apparently after Pouliot left, that the bag had not been stolen), Pouliot took his truck and proceeded west, then north to East May, where he turned east. He was traveling slowly, looking for anything suspicious. He testified that he believed he had authority to investigate these break ins of the trucks and the theft of the Trique bag because he was a Border Patrol Agent with peace officer designation.

As he drove east on East May, he saw the plaintiff turn on to May and proceed west on the north side of the street. As they passed each other, he saw plaintiff "staring" at him. He stopped and watched plaintiff as plaintiff rode west, crossing to the south side as he neared 1208 East May. He testified that he became suspicious because of plaintiff's continuing to watch him, so he put his truck in reverse and began backing westbound on East May. When he arrived at East May, he stopped about opposite plaintiff. He testified his intention was to ask plaintiff some questions as to whether plaintiff had seen anyone around that may be suspicious. He testified he held his badge in his left hand up to the window and observed plaintiff looking at him and apparently at his badge and then yelling something, apparently to persons behind the truck. He opened his door to step out, with his badge in his left hand. At that time, the plaintiff threw his bike to one side and ran, crouched over, to the west behind two vehicles parked there.

Pouliot testified that he observed plaintiff reach under his shirt as he was running, and Pouliot concluded

plaintiff may have been reaching for a gun. Pouliot testified he then leaned back into his truck and retrieved a revolver which he carried in the truck. As he stepped outside the truck with the gun, the plaintiff was running with his back to Pouliot, he stopped momentarily behind the trucks and then went over the fence and disappeared behind the west side of the house. As he was moving away from Pouliot, defendant yelled "freeze." Pouliot claims he never raised his gun or pointed it at plaintiff and that he always carried it in his right hand. These events took only a matter of a minute or two.

Plaintiff claims that after Pouliot backed his truck to where he was, Pouliot got out of his truck with a gun in his left hand, pointed it at plaintiff and yelled: "Get the fuck out of here." Plaintiff testified that he was terrified, he threw his bike down and ran in a crouched position behind the cars parked in front of 1208 East May. He then jumped the fence and ran behind Kathy and Chuey's house. One of the police reports, Exhibit 2, reflects that when Pouliot allegedly yelled at him, he replied with words to the effect: "I don't even fucking know you." He testified that this entire incident in front of 1208 East May Street lasted only a matter of seconds.

There is no dispute in the evidence that Pouliot never stated that he was a police officer and wanted to speak with plaintiff. The only effort he made to identify himself was holding up his badge to his windshield, which he thought plaintiff had seen. The Court believes that police officers, in

-9-

these circumstances, should take simple expedient of verbally identifying themselves. There is no excuse for Pouliot's failure to so advise plaintiff of who he was. That simple act might have obviated this suit.

Shortly after this incident, while defendant Pouliot was still in the street in the area of 1208 East May, he heard other agents so he went to the corner and called for help. Agent Dalton, who was out in his truck, came and parked by Pouliot. They could not see anyone, concluded that the bicycle may have been stolen, and loaded it in Dalton's truck. They then drove west meeting a Las Cruces patrol car. They explained what happened and gave the bicycle to the police, suggesting it may have been stolen. They then returned to the bowling alley, where the police later came to take their statements. The police went to 1208 East May and, after talking to plaintiff and taking his statement, returned his bike.

Having examined all of the evidence, including the parties' testimony as to the events on March 16, 1995, the Court finds that the testimony of Agent Pouliot more credibly describes the events which occurred at 1208 East May, and the Court generally adopts his version as representing the operable facts in this case.

### DISCUSSION

1. **Assault**

Plaintiff alleges that the defendants are liable for an assault committed by Agent Pouliot. For there to be a tortious

assault under New Mexico law, there must have been an "act, threat, or some other menacing conduct which causes another person to reasonably believe that he or she is in danger of receiving an immediate battery." *Baca v. Velez*, 833 P.2d 1194, 1196 (N.M.Ct.App. 1992). An assault, which is the placing of another person in fear, may exist without a battery, which is the unwanted touching or physical contact with another person. *Id.* The question before this Court is whether it was reasonable for plaintiff to feel threatened and in danger of being battered by the events of March 16, 1995.

The plaintiff claims that the assault occurred when Pouliot opened the car door and exited the vehicle. At this point in time, Pouliot did not have the means at hand to inflict any serious harm on plaintiff, regardless of plaintiff's perception to the contrary. Pouliot was some fifteen to twenty (15 to 20) feet away and had only his badge in his hand. Pouliot obtained his gun only after plaintiff started running and appeared to reach under his shirt. The Court finds that a reasonable person in plaintiff's situation would not have been fearful of an immediate battery. Moreover, since assault is an intentional tort, there must be some evidence indicating that Pouliot intended to inflict harm upon plaintiff. The evidence does not support such a finding. Considering all of surrounding circumstances, the Court finds that Pouliot did not assault the plaintiff on March 16, 1995, and there is no basis to find that he was reasonably placed in fear of danger.

## 2. Intentional Infliction of Emotional Distress

Plaintiff seeks damages for Pouliot's intentional infliction of emotional distress. To establish a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant "engaged in extreme and outrageous conduct which was done recklessly or with the intent to cause severe emotional distress." *Silverman v. Progressive Broadcasting, Inc.*, 964 P.2d 61, 70 (N.M.Ct.App. 1998). *See also* UJI 13-1628 NMRA 1998. "Extreme and outrageous conduct is described as conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* This claims fails because Pouliot's actions did not rise to the level of extreme and outrageous conduct which is intolerable in society.

## 3. Theft

Plaintiff alleges that the defendants are liable for theft. As the United States pointed out, there is no tort of theft in New Mexico. However, the Court will construe plaintiff's allegations to be a claim for conversion. The New Mexico courts have defined conversion as a "wrongful detention amounting to repudiation of the owner's rights or any exercise of dominion inconsistent with such rights." *Case Credit Corp. v. Portales Nat'l Bank*, 966 P.2d 1172, 1174 (N.M. 1998); *Apodac v. Unknown Heirs*, 651 P.2d 1264, 1268 (N.M. 1982). *See also Harrell v. Hayes*, 965 P.2d 933, 937 (N.M.Ct.App. 1998) (stating that

-12-

conversion "consists of the receipt or taking possession of personal property of another to the exclusion or in defiance of the owner's rights, unauthorized or injurious use of such property, or the wrongful retention of such property following a demand for its return."). Pouliot's and Dalton's taking the bicycle and giving it to the Las Cruces police was not a wrongful detention or an unauthorized taking because they reasonably believed that the bicycle was stolen. This was a reasonable explanation for why the plaintiff threw the bike down and began running from Pouliot. Pouliot only had the bike for a few minutes before turning it over to the police, and the police returned the bicycle to plaintiff within two hours after it was taken. Plaintiff's counsel conceded that the only possible damages plaintiff suffered under this theory was the loss of the use of his bicycle for two hours. Plaintiff presented no evidence that the bicycle was returned in any worse condition than when it was taken. The Court concludes that plaintiff suffered no damage, and that there was no conversion of his bicycle.

### 4. Constitutional Violations[2]

The Supreme Court has held that Congress did not intend to pre-empt a *Bivens* remedy when it enacted FTCA, and therefore,

---

[2] Claims for constitutional violations are not cognizable against the United States under the FTCA. The court will only discuss the constitutional violations under *Bivens* alleged against Agent Pouliot. The remedy recognized in *Bivens* for constitutional violations is not applicable to the United States and its agencies. *Dahn v. United States*, 127 F.3d 1249, 1254 (10th Cir. 1997).

an inmate could pursue a *Bivens* action independent of a FTCA action. *Garrett v. Hawk*, 127 F.3d 1263, 1266 (10th Cir. 1997). In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court recognized a federal cause of action for monetary damages against individual federal officers for violations of constitutional rights. *Applewhite v. United States Air Force*, 995 F.2d 997, 1000 n.8 (10th Cir. 1993). This implied right of action "only applies against the individual in his individual capacity." *Chapoose v. Hodel*, 831 F.2d 931, 935 (10th Cir. 1987). *Bivens* recognized a cause of action against federal officers alleged to have violated the Fourth Amendment. *La Compania Ocho, Inc. v. United States Forest Service*, 874 F.Supp. 1242, 1245 (D.N.M. 1995). Subsequent decisions have extended the availability of *Bivens* actions to alleged violations of other constitutional rights, such as the Fifth Amendment and the Eighth Amendment. *Id.* In the instant case, plaintiff alleges the following constitutional violations against defendant Pouliot: (1) a Fourth Amendment right to be free from unreasonable searches and seizures, (2) a Fifth Amendment right not to be deprived of property without due process of law, and (3) an Eighth Amendment right to be free from cruel and unusual punishment.

### a. Fourth Amendment

Plaintiff contends that Pouliot violated his Fourth Amendment right by stopping Rivera without having reasonable

-14-

suspicion that he was involved in criminal activity. Plaintiff argues that the alleged look plaintiff gave Pouliot and the alleged lack of concentration on where he was going are not sufficient to justify an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968). However, plaintiff was never detained or stopped by Pouliot. In fact, the undisputed facts on the record demonstrate that plaintiff stopped at the house because he had reached his destination, not because Pouliot ordered him to stop at the house. Plaintiff had crossed the street and virtually arrived at his friend's house as Pouliot was backing up his truck. As soon as Pouliot opened the door and was about to get out, plaintiff immediately started running. Plaintiff claims that a seizure occurs when an officer "by means of physical force or show of authority . . . in some way restrains the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968). Plaintiff claims that he was not free to leave when he paused behind two vehicles. However, plaintiff did in fact leave. There is no evidence that there was any stop. In *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990), the court stated that an officer seeking the citizen's voluntary cooperation through non-coercive questioning is not a "seizure" within the meaning of the Fourth Amendment. It is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Id.* The test for determining whether a person has been "seized" within the meaning of the Fourth Amendment involves

-15-

examining, in view of all the circumstances surrounding the incident, whether a reasonable person would have believed that he was not free to leave. *Id.* at 1509 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). In *Johnson*, the plaintiff was approached by police officers about the possibility of drugs in her luggage. She was told she could leave at any time, and in fact, she did leave after speaking with her attorney. The court stated that "[w]hen a citizen's liberty is not restrained by the police, no Fourth Amendment rights are implicated." *Id.* at 1509. Even though the officers planned to speak with her because of the drug courier profile, their actions did not restrain her liberty in any way. *Id.* at 1509. Her entire encounter with the police lasted fewer than ten minutes and she ultimately did leave the station without hindrance from the officers. *Id.* at 1509. In the same way, Jason Rivera could not have felt that he was not free to leave when he did in fact run around to the back of 1208 East May. As a result, no seizure or stop occurred. Plaintiff took off running as soon as Pouliot was exiting the truck, and plaintiff never stopped running until he got to the back door of the house. Pouliot did not detain plaintiff at any time. Thus, there was no Fourth Amendment violation.

### b. Fifth Amendment

The Fifth Amendment Due Process Clause guarantees that government action may not deprive a person of life, liberty or property unless the government affords a fair procedure to contest the deprivation. *United States v. Jones*, 160 F.3d 641,

645 (10th Cir. 1998). Plaintiff claims that he was deprived of his substantive and procedural due process rights because Pouliot turned over plaintiff's bicycle to the local police. The Court finds that this was not a "deprivation" that constitutes a Fifth Amendment violation. Pouliot and Dalton reasonably suspected that plaintiff had abandoned the bike and took off running because it was stolen. The bike was lawfully seized pursuant to an investigation into a crime and was promptly returned when it was discovered that the bike was not stolen. Thus, no Fifth Amendment violation occurred.

### c. Eighth Amendment

Plaintiff's Eighth Amendment claim also lacks merit. Case law has recognized that the Cruel and Unusual Punishments Clause in the Eighth Amendment circumscribes the criminal process in three ways: first, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such. *Ingraham v. Wright*, 430 U.S. 651, 667, 97 S.Ct. 1401, 1410 (1977). Thus, "the Cruel and Unusual Punishments Clause has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes." *Id*. Because plaintiff has not been convicted of a crime, he does not state an Eighth Amendment violation.

### III. CONCLUSION

Based on the foregoing, the Court finds that defendants are not liable for assault or intentional infliction of emotional distress on the plaintiff; for conversion; or for violations of plaintiff's fourth, fifth, or eight amendment rights. Plaintiff's complaint will be dismissed. A separate order will be entered in accordance with this memorandum opinion.

DATED this 30th day of March, 1999.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court